MARC P. BERGER
REGIONAL DIRECTOR
Sanjay Wadhwa
Michael D. Paley
Judith A. Weinstock
Paul G. Gizzi
Kristine Zaleskas
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-0077 (Gizzi)
Email: gizzip@sec.gov

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                      Plaintiff,<br><br>      -against-<br><br>ULRIK DEBO,<br><br>                      Defendant. | **COMPLAINT**<br><br>20-CV-6<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against defendant Ulrik Debo ("Debo"), alleges as follows:

### SUMMARY

1. From at least April 2019 through the present, Debo has orchestrated and almost finished implementing a fraudulent scheme to secretly control a microcap shell company—Herbatech Life Inc. (ticker symbol: EVTP)—and promote its stock to pump and dump its shares for profit.

2. With two other business partners, Debo devised a scheme to purchase a dormant

microcap shell company, install a nominee chief executive officer who would purportedly control the majority of the shares, file misleading disclosures to enable the company's shares to trade actively, and fraudulently promote the company and its stock to the investing public while secretly selling the shares at a significant profit.

3. Debo has since purchased the shell company, installed the nominee CEO, and had a misleading disclosure statement—concealing his control of the company—posted on an over-the-counter trading market's website.

4. The Commission seeks a permanent injunction, disgorgement and civil penalties, and a penny stock bar as a result of Debo's ongoing fraudulent conduct.

## VIOLATIONS

5. By virtue of the foregoing conduct and as alleged further herein, Debo violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

6. Unless Debo is restrained and enjoined, he will engage in the acts, practices, and courses of business set forth in this Complaint or in acts, practices, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND THE RELIEF SOUGHT

7. The Commission brings this action pursuant to the authority conferred upon it by Exchange Act Section 21(d)(1) [15 U.S.C. § 78u(d)(1)].

8. The Commission seeks a final judgment: (a) permanently enjoining Debo from violating Exchange Act Section 10(b) and Rule 10b-5; (b) ordering Debo to disgorge any ill-gotten gains he received as a result of the violations alleged here and to pay prejudgment interest thereon; (c) ordering Debo to pay civil money penalties pursuant to Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)]; (d) permanently prohibiting Debo, pursuant to Exchange Act Section 21(d)(6)(A) [15

U.S.C. § 78u(d)(6)(A)], from participating in an offering of penny stock; and (e) ordering any other and further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

9. This Court has jurisdiction over this action pursuant to Exchange Act Section 27 [15 U.S.C. § 78aa].

10. Debo, directly and indirectly, has made use of the means and instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange, in connection with the acts, practices, and courses of business alleged herein.

11. Venue lies in this district pursuant to Exchange Act Section 27 [15 U.S.C. § 78aa]. Many of the acts, practices and courses of business constituting the violations alleged herein occurred within the Southern District of New York. For example, Individual A participated in phone calls from Manhattan in furtherance of the alleged scheme, and Debo directed one or more persons under his control to submit certain paperwork necessary to further the alleged scheme to personnel in Manhattan.

## DEFENDANT

12. **Debo**, age 50, is a Danish citizen and currently a resident of Monaco. He purports to be an investment adviser with Imali Securities Ltd. ("Imali"), which purports to be a portfolio company located in the Cayman Islands.

## OTHER RELEVANT ENTITY AND INDIVIDUALS

13. **Herbatech Life Inc. or EV Transportation, Inc. ("Herbatech")** is a Nevada corporation with headquarters in San Francisco, California. From August 8, 2008 through at least November 14, 2019, the company was known as EV Transportation, Inc. and purported to be in the business of renting out environmentally sensitive vehicles. On December 5, 2019, the company submitted an application to the Financial Regulatory Industry Authority ("FINRA") to process its

3

name change to Herbatech Life Inc. and a reverse stock split, but that application has not been granted to date. During all relevant times, Herbatech was a penny stock as defined by Rule 3a51-1 of the Exchange Act [17 C.F.R. §240.3a51-1], because the stock traded below five dollars per share and did not satisfy any of the exceptions to the definition of "penny stock" set forth in Rule 3a51-1.

14.  **Individual A** is a Virginia resident.

15.  **Individual B**, a resident of Switzerland, is a part-owner of a Swiss entity that purports to be an asset management firm.

## FACTS

### I. Background

16.  From at least 2015 through early 2019, Debo and Individual A worked on one or more transactions involving microcap shell companies.

17.  While doing so, both Debo and Individual A used the services of Individual B's Swiss entity from time to time.

### II. Debo Acquires a Microcap Shell Company

18.  In early 2019, Debo began discussing the possibility of buying a microcap shell corporation with Individuals A and B.

19.  Together, the three of them discussed issuing stock in a microcap company to nominee individuals and entities under their control and then "pumping and dumping" the issuer's stock—in other words, promoting (or "pumping") the stock to unsuspecting investors to raise the stock price and trading volume and then selling their own shares at a profit ("dumping").

20.  Debo mostly discussed these plans with Individuals A and B over the telephone, and Individual A often participated in the calls from Manhattan.

21. Debo and Individuals A and B discussed that, in deciding which shell to purchase, they should not purchase a shell with U.S. shareholders, because, among other things, they were concerned about a U.S. regulatory investigation.

22. Debo also told Individuals A and B that, although he wanted the new shell to claim to be a cannabis-related company, he did not plan to include "CBD" in the name of the company, because companies with that term in their names received more regulatory scrutiny.

23. Debo eventually decided that the shell company the group acquired would be renamed Herbatech Life Inc., as he told Individuals A and B.

24. Debo agreed to take responsibility for the steps required to acquire the shell company, assume control over it, and ensure that its shares could be publicly traded. These steps included retaining attorneys and ensuring that the shell submitted the required filings and applications to OTC Markets Group, which operates OTCQX, OTCQB, and Pink, inter-dealer stock quotation services; the Financial Industry Regulatory Authority ("FINRA"); and the Commission.

25. Meanwhile, Individual A agreed to provide $200,000 to purchase the shell company that would become Herbatech, with $100,000 up front and an additional $100,000 installment at a later date.

26. Individual A also agreed to trade Herbatech's stock during the later pump-and-dump phase.

27. Finally, Individual B agreed to provide nominee brokerage accounts using his Swiss entity's network of broker-dealers. The nominee brokerage accounts had two purposes, as Debo understood. First, the nominee accounts would make it difficult for regulators to trace who owned Herbatech's stock. Second, the nominee accounts would ensure that no single brokerage account held more than five percent of Herbatech's shares, in order to evade the Commission's reporting

requirements for shareholders who own more than that percentage of a public company's stock.

28. By May 2019, Debo had identified a microcap shell company to purchase, EV Transportation, Inc., and he and Individuals A and B decided to purchase it.

29. Although the shell company already had a ticker symbol (EVTP) and its shares had publicly traded, it had not filed a required periodic report with the Commission since December 22, 2008, and thus had been delinquent in its filing obligations. OTC Markets' website listing for the company therefore reflected its delinquent filing status.[1]

30. As a result, the company's stock traded infrequently.

31. Around the time Debo and Individuals A and B decided to purchase the company, Individual A arranged for $50,000—the first half of the $100,000 up-front payment—to be wired to Debo.

32. On May 2, 2019, Debo texted Individuals A and B to inform them that the first wire transfer to the sellers of the shell company had been sent.

33. Individual A then arranged for a second wire transfer of the remaining $50,000 of the up-front payment to be sent to Debo.

34. When the final $100,000 installment came due, Individual A told Debo he would not provide the final payment until after the shell's shares were ready to be publicly traded.

35. Debo then told Individual A that Debo had made the final $100,000 payment, and the two of them agreed that Individual A would reimburse Debo later.

### III. Debo Takes Steps to Enable the Dormant Shell Company's Shares to Trade Actively

36. Over the next few months, Debo took steps to enable the shell company's shares to be actively traded, including by filing previously-delinquent disclosure reports with the Commission

---

[1] On April 10, 2019, the company filed a Form 15 terminating its obligation to file periodic reports with the Commission.

and filing reports with OTC Markets. Through calls and text messages, Debo kept Individuals A and B apprised of his progress.

37. On June 14, 2019, Debo sent Individual B an email attaching a draft disclosure report for the shell company. The draft identified Artur Bielski ("Bielski")—who had worked with Debo at Imali—as the shell company's CEO.

38. On June 17, 2019, Debo sent Individuals A and B an email that attached a spreadsheet outlining a schedule for the project. The scheduled included preparing paperwork to remove current officers and appoint new ones; applying for access to the OTC Markets' disclosure and news service, which would allow the company to post its reports and press releases on OTC Markets' website; and reviewing and finalizing the shell company's periodic disclosure reports with the Commission for posting on the OTC Markets website.

39. In August 2019, Debo directly or indirectly began the process of applying to OTC Markets' disclosure and news service for the shell company and communicated with OTC Markets' personnel in Manhattan by email to do so.

40. In August 2019, Debo informed Individuals A and B that the shell company's OTC Markets application was still pending but that the company's recent Commission disclosure reports were ready to be filed.

41. In mid-September 2019, Debo sent Individuals A and B another schedule with target completion dates for the various tasks leading up to full control of the shell and the planned pump-and-dump.

42. On approximately October 10, 2019, Debo told Individuals A and B that OTC Markets was close to approving the shell company's disclosure and news service application. Debo told them of the "good news" that OTC Markets had asked for payment information and said: "[W]e are officially in business with EVTP and 24 hrs after payment clears it goes live."

7

43.     From January 1, 2016 through October 15, 2019, the shell company had only two days on which more than 140,000 of its shares traded, and on many days no shares of the company changed hands in reported trading.

44.     On October 15, 2019, Debo had the shell company submit required quarterly and annual reports to the Commission, for periods dating from January 1, 2017 through March 31, 2019, so that the shell company was no longer delinquent with its filings for those periods. OTC Markets posted these reports on its website entry for the shell company.

45.     The next day, the shell company's reported trading volume reached 342,296 shares traded for the day.

46.     Over the next few weeks, Debo had the shell company submit additional disclosure reports and attorney letters to the Commission to cure prior delinquencies.

47.     On October 23, 2019, Debo again spoke to Individuals A and B by phone and gave them another detailed update on the progress of the deal. Debo described the steps he had taken, including the filings he had made with OTC Markets and his arrangements for a required attorney letter to be delivered to OTC Markets that same day: "You've seen the filings done...twelve to thirteen filings up...the attorney letter which is the last piece that is needed before it goes current, that attorney letter is in draft form as of last night, I saw it last night, a couple of small things that needed to get changed. I'm being told it's being delivered to OTC today."

48.     On the same call, Debo explained that it normally took 24 hours for the filings to become "current." Debo further explained that, "the moment it [wa]s current," the new CEO would be appointed, the company could file the required form with the Commission, and he and Individuals A and B would be "effectively, in control of the shell."

49.     Finally, on the same call, Debo laid out the next steps in their scheme, including making a Regulation A filing with the Commission to allow the shell company to offer shares to the

8

public. Debo also relayed his discussions with a marketing promoter about how to pitch the shell company's purported new products.

50.     On approximately November 1, 2019, Debo texted Individuals A and B to tell them the plan was that "Sec [sic] and FINRA filings will go in next week for name ticker change etc."

51.     On approximately November 5, 2019, Debo installed Bielski as the shell company's director, president, treasurer, and secretary—its only purported officer—as planned.

52.     On approximately November 9, 2019, Debo texted Individuals A and B. He told them that the shell company's board resolutions had been signed and sent to the lawyers so that the lawyers could file for a name and ticker change, among other things. Debo also said that a control block of the shell company's shares had been recently issued to the company's new CEO—meaning Bielski—so that the company was "officially underr [sic] the ceo."

### IV.     Debo Directs the Posting of a Misleading Report on OTC Markets' Website

53.     On approximately November 22, 2019, Debo had the shell company submit to OTC Markets a quarterly financial report for the quarter ended September 30, 2019, as well as a disclosure statement.

54.     On November 25, 2019, OTC Markets published the quarterly financial report on its website entry for the shell company.

55.     The report identified the company as "Herbatech Life Inc. (Formerly EV Transportation, Inc.)" and claimed that the company "will offer retail consumers bottled CBD water and a CBD energy drink which will be produced by using nanotechnology," among other things.

56.     In the section entitled "Officers, Directors, and Control Persons," the form report included the following instructions to the company completing the form:

> The goal of this section is to provide an investor with a clear understanding
> of the identity of all the persons or entities that are involved in managing,
> controlling or advising the operations, business development and disclosure
> of the issuer, as well as the identity of any significant or beneficial

9

shareholders. Using the tabular format below, please provide information regarding any person or entity owning 5% or more of the issuer, as well as any officer, and any director of the company, regardless of the number of shares they own.

57. In response to these instructions, the shell company's report claimed that the former CEO had resigned on November 5, 2019, and that Bielski had been appointed the shell company's new "Director, President, Treasurer and Secretary."

58. This report section further claimed that Bielski "own[ed] 90,000,000 shares, or 54.96% of the current total issued and outstanding shares."

59. Nowhere in this section did the report identify Debo.

60. In a later section of the report, entitled "Third Party Providers," the form instructed the company completing it to list its counsel, accountant or auditor, investor relations consultant and "Other Service Providers" as follows (with emphasis in the original): "Provide the name of any other service provider(s), including, counsel, advisor(s) or consultants **that assisted, advised, prepared or provided information with respect to this disclosure statement**, or provided assistance or services during the reporting period."

61. In response to these instructions, the shell company's report responded: "None."

62. Debo's name appeared nowhere in the shell company's report.

63. Bielski electronically certified and signed the report on the shell company's behalf.

64. On November 28, 2019, three days after OTC Markets posted the report on its website listing for Herbatech, Debo texted Individual A. Debo provided another update and informed Individual A that the company had made the quarterly OTC Markets report. Debo told Individual A: "[I]t is all moving forward, I can't push harder on my end as it is all sequential steps."

65. From mid-October 2019 through the present, the shell company's shares have been actively traded. During this period, however, neither Debo, Individual A, nor Individual B has artificially inflated the trading price of the shares through promotional efforts.

66. From October 16 through December 2, 2019, the shell company's average trading volume was 80,479 shares, with its stock price ranging from $0.0162 to $0.068 per share.

## CLAIM FOR RELIEF
### Violations of Exchange Act Section 10(b) and Rule 10b-5

67. The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 66.

68. Defendant, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly have (i) employed one or more devices, schemes, or artifices to defraud, (ii) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

69. By reason of the foregoing, Defendant, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that the Court enter a Final Judgment:

### I.

Permanently enjoining Debo and his agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5];

II.

Ordering Debo to disgorge all ill-gotten gains he received directly or indirectly, with pre-judgment interest thereon, as a result of the alleged violations;

III.

Ordering Debo to pay civil money penalties under Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)];

IV.

Permanently prohibiting Debo, from participating in any offering of a penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock, under Exchange Act Section 21(d)(6) [15 U.S.C. § 78u(d)(6)]; and

V.

Granting any other and further relief this Court may deem just and proper.

Dated: January 2, 2020
New York, New York

_____
MARC P. BERGER
REGIONAL DIRECTOR
Sanjay Wadhwa
Michael D. Paley
Judith A. Weinstock
Paul G. Gizzi
Kristine Zaleskas
Attorneys for Plaintiff
SECURITIES AND EXCHANGE
  COMMISSION
New York Regional Office
200 Vesey Street, Suite 400
New York, New York 10281
(212) 336-0077 (Gizzi)
Email: gizzip@sec.gov